# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| vs. | ) |
| | )    **CR 13-28 ERIE** |
| GEROD MAURICE JARRETT, | ) |
| | ) |

## OPINION AND ORDER

Defendant Gerod Maurice Jarrett is charged in a one-count Indictment with Possession of

a Firearm by a Convicted Felon in violation of 1 U.S.C. § 922(g)(1). Presently before the Court

is Defendant's "Motion to Suppress" [ECF No. 28]. In it he seeks an Order that would suppress

a loaded firearm and ring found by the police when Mr. Jarrett was stopped while driving his

girlfriend's black SUV, as well as several statements he made to the police after he was arrested.

In response to Defendant's Motion to Suppress, and 2 supplemental briefs, Defendant's "Post-

Hearing Brief" and "Defendant's Reply to Government's Response to His Post-Hearing Brief,"

the Government filed five (5) responses/briefs: (1) "Government's Response to Defendant's

Motion to Suppress," "Government's Supplemental Response to Defendant's Motion to

Suppress," "Government's Post-Suppression Hearing Brief," "Government's Response to

Defendant's Post-Hearing Brief," and "Government's Surreply to Defendant's Reply."

A hearing on the Motion to Suppress was held on November 21, 2013. At the hearing

credible testimony was presented from the following witnesses, all law enforcement personnel:

(1) Jason Triana; (2) Jerry Stevens; (3) William Goozdich; (4) Rick Lorah; (5) Jamie Russo; and

(6) Pete Mitchell. For the reasons that follow, Defendant's motion to suppress is denied.

## I. Facts.

The first law enforcement officer to testify at the hearing was Jason Triana ("Detective Triana"). He is a detective with the Erie Police Department and testified credibly. On April 9, 2013, Detective Triana was investigating a robbery that had occurred on April 8, 2013; the victim had been robbed at gunpoint of jewelry, including a ring that was silver with a yellow top, and money. The weapon used in the robbery was a large, dark in color, semiautomatic handgun. The victim had seen the robber prior to the robbery in a dark colored sport utility vehicle ("SUV"). The victim knew the robber to have the nickname "Smoke." Detective Triana was familiar with that nickname because a week before the April 8 robbery, an anonymous tip had been called in on another robbery; the caller had said that the earlier robbery, of a gas station, had been committed by Gerod Jarrett, whose nickname was "Smoke."

Based on this information, Detective Triana created a photo lineup that included Mr. Jarrett's photo, and had the robbery victim come to the police station and look at the photos. The victim immediately identified Mr. Jarrett's photograph as the man who robbed him. Detective Triana then filed a complaint for a warrant for Mr. Jarrett's arrest, charging Mr. Jarrett with robbery, aggravated assault, unlawful taking, recklessly endangering another person, persons not to possess or manufacture, control or sell firearms, possessing instruments of a crime, terroristic threats, and receiving stolen property.

Detective Triana also reviewed Mr. Jarrett's criminal history; so he knew he had several prior felony convictions, including a conviction for stabbing a prison guard in the face, a home invasion robbery, and firearms offenses. He also knew that Mr. Jarrett was on state parole.

After the complaint was signed and the arrest warrant obtained, Detective Triana then compiled a wanted poster with Mr. Jarrett's name, his aliases, the most current photographs he

had of Mr. Jarrett, his date of birth, gender, race, height, hair color, eye color, a list of the crimes for which there was an outstanding warrant, that Mr. Jarrett was armed and dangerous and that he'd been last seen in a black truck or SUV.

Around 4:00 p.m. on April 9, 2013, Detective Triana gathered the Erie police department's Saturation Unit and some of the patrolmen that were working the street at the time, including Officers Jerry Stevens and William Goozdich. He handed out the wanted poster and discussed serving the arrest warrant on Mr. Jarrett at his place of business. Detective Jarrett and these officers then left the police station by vehicle to effectuate the warrant.

A few minutes after leaving the police station, Detective Triana heard over the police car's radio, from Officers Goozdich and Stevens, that the wanted person, Mr. Jarrett, had just driven past them and they had performed a traffic stop in the Boston Store parking lot, at 7th and State Streets, which is located across the street from the police station.

When Detective Triana arrived at the traffic stop, Mr. Jarrett was already in custody; Officers Goozdich and Stevens had the Defendant in handcuffs and were walking him across the street to the police station. Detective Triana noticed that Mr. Jarrett was wearing a necklace, watch, and bracelet that matched the description of jewelry the victim said had been stolen from him the day before.

Either Officer Goozdich or Officer Stevens and Officer Lorah told Detective Triana that a weapon had been found in plain view under the driver's seat. Detective Triana went over to the black SUV that Defendant had been driving and from the outside of the car, the driver's door which he believed was open, he could clearly see the butt of an automatic weapon underneath the seat.

Detective Triana instructed Officer Lorah to photograph the weapon under the seat and then secure the weapon.

At some time after the stop, Officer Goozdich told Detective Triana that Jarrett had told him that he'd left a ring on the top of his car, but that actually the ring was found under the seat by the firearm. Detective Triana did not notice the ring next to the gun when he first saw the gun.

Detective Triana had a tow truck driver come to tow the SUV across the street to the police department's underground lot . When the tow truck arrived, the driver explained that because it was an all-wheel vehicle, he needed a flatbed truck to tow the vehicle. That caused a problem, because a flatbed truck with a vehicle on it does not fit in the underground lot of the police station. So Detective Triana decided that he and Officer Stevens would drive the SUV across the street and into the police station's underground lot, which they did.

When Detective Triana drove the vehicle to the lot, it was his intention to apply for a search warrant the next day. In the end, however, he did not need to apply for one because the vehicle's owner, Tracey Clark, Jarrett's girlfriend, called the station and agreed to meet with Detective Triana in order to give consent for the vehicle to be searched. Written consent, a copy of which was admitted into evidence at the suppression hearing, was given after Detective Triana explained to Ms. Clark what had happened, including that they'd found a stolen firearm in the vehicle, and that he was going to get a search warrant for the vehicle because he was investigating a robbery. Ms. Clark also consented to having her apartment/motel room searched.

As a result of the search of the SUV, Detective Triana found a silver ring with a yellow top that matched the description provided by the victim of the April 8 robbery, an id card of Gerod Jarrett, and a black cell phone.

4

Erie police officer Jerry Stevens ("Officer Stevens") testified next at the suppression hearing and testified credibly. Officer Stevens explained that on April 9, 2013, he was given a copy of a wanted poster by the police department's security officer and Detective Triana. The poster contained photographs of Defendant and other identifiers, such as name, date of birth, race, height, weight, hair color, eye color, a brief description of what he was wanted for, which included a weapons charge, and an incident number. The wanted poster stated that Defendant had been last seen in a black SUV or truck. In addition to the information on the wanted poster, Officer Stevens and the others were told by another officer, he was not sure which one, that the vehicle was a black Saturn Vue, with a plate number JBL-0919. He wrote that information down on his copy of the wanted poster.

After receiving the poster, he and his partner, Officer Goozdich, left the station and got into their police vehicle. They were stopped at the traffic light at the corner of 7th and French Streets, and Officer Stevens, who was the passenger in the police car, had the wanted poster on his lap. Officer Stevens looked and saw a black Saturn Vue, which is an SUV, across the intersection from their police cruiser stopped at the same traffic light at which they were stopped. Officer Steven then observed that the driver of the vehicle appeared to be the individual in the wanted poster. Officer Stevens told this to Officer Goozdich. At this point, the traffic light turned green and the black SUV drove past the police car. At that point, Officer Stevens confirmed that the driver of the SUV clearly was the person in the wanted poster. He was also able to confirm, looking in the mirror, that the plate number of the SUV was the one they'd been provided.

At this point, Officer Goozdich turned the police car around so that he was directly behind Defendant's SUV on Seventh Street and when Defendant pulled the vehicle into the

Boston Store parking lot, the officers executed a traffic stop by turning on their lights and siren. The Boston Store parking lot is across the street from the Erie police station.

As the officers approached the SUV, Officer Stevens, who was approaching on the passenger side of the car, saw the driver, Mr. Jarrett, bend down, dipping his right shoulder in a movement that appeared to be his reaching underneath the driver's seat. At this point, based on the information that they had about him, that he was armed and dangerous, Officer Stevens believed that Jarrett was either putting a gun underneath the seat or picking one up, and he drew his weapon.

Officer Stevens heard Officer Goozdich ask Jarrett to exit the vehicle, which he did, leaving the driver's side door open. Jarrett was told that there was a warrant for his arrest, they took him into custody, handcuffed him, and placed him in the cruiser. At some point after they had put Jarrett in cruiser, Officer Goozdich told Officer Stevens that he'd seen a weapon under the driver's seat.

Officers Stevens and Goozdich took Jarrett across the street to the police station to be booked; Officer Stevens didn't recall whether they drove or walked with him to the station.

Officer Stevens was present when Jarrett was booked and heard Jarrett say at the booking counter, without anyone questioning him, that he thought he'd left a ring on top of the vehicle with his keys. So Officer Stevens went back to the vehicle to look for the ring; it was not on top of the vehicle. At that point, Detective Triana asked Officer Stevens to drive with him in the SUV to the police underground parking lot, which he did. They did not move anything in the vehicle.

Erie police officer William Goozdich ("Officer Goozdich"), Officer Stevens' partner, testified next at the suppression hearing and testified credibly. Officer Goozdich testified that he

6

was on duty on April 9, 2013 when he and his partner Officer Stevens were told to come to the police station to get a wanted poster. They did so. It was the wanted poster for Defendant; it included a description of Jarrett as well as a good frontal picture and a side profile picture. They were also told at that time that he had a violent history and that he possibly could be driving a black Saturn Vue with plate number JBL-0919. They wrote the plate number down on the wanted poster.

When they left the police station after getting the wanted poster, Officer Goozdich was driving the marked police cruiser. The car was at the intersection of Seventh and French Streets, stopped at a red light, when Officer Stevens told him "that's him right there." Officer Goozdich then looked up and saw a black Saturn Vue directly across the street stopped at the same light as they were, headed westbound on Seventh Street. At that time the light turned green and the Defendant drove directly past then at a slow rate of speed. At that time Officer Goozdich was able to confirm that it appeared to be the person in the wanted poster. He looked at the wanted poster and compared the photo to the person who drove past them.

Officer Goozdich then turned south on French Street, pulled into a bank parking lot at the corner, drove back onto Seventh Street, and got immediately behind the Saturn Vue as it was stopped at a red light at State and Seventh Streets. He had a clear view of the license plate and observed that it matched the information they had written down about the plate on the wanted poster.

The black Vue then turned into the Boston Store parking lot. He followed the vehicle into the lot and activated his lights and siren. The SUV stopped and Officer Goozdich was exiting the police car when he observed the Defendant lean forward, dipping his right shoulder down towards the area of the driver's side floor, which indicated to Officer Goozdich that the

Defendant was either reaching down to grab something or reaching to put something down in that area. Given that he knew the Defendant to be armed and dangerous, his biggest concern was that there was a weapon in the SUV.

Officer Goozdich saw that Officer Stevens had drawn his weapon, but he approached the driver's side of the vehicle without doing so. As he approached the vehicle, the window was down. Officer Goozdich said hello and Defendant asked what he was being stopped for. Officer Goozdich told him that they had a drive off of gas and that his vehicle fit the description. Officer Goozdich said Defendant had appeared very nervous when he first approached but that Defendant calmed down and told Officer Goozdich that he had not taken any gas and for Officer Goozdich to look at the gas gauge to see that the tank was almost empty.

Officer Goozdich told Defendant to shut off the Vue, which Jarrett did, keeping the keys in his hand, and to step out of the vehicle. Officer Goozdich then told Defendant to put his hands on the top of the vehicle, which he did as well. Jarrett placed the car keys on the top of the Vue and left the driver's side door to the vehicle wide open. Officer Goozdich then handcuffed him and told him that he had a warrant for his arrest. Officer Goozdich left the keys on the top of the vehicle and walked Defendant back to the police cruiser, where Jarrett was placed in the cruiser.

It was at this point that a number of other police officers arrived on the scene.

After walking Defendant back to the cruiser Officer Goozdich returned to the SUV and with the door fully open, he was able to lean downward and see that under the driver's seat of the Vue there appeared to be a black firearm. He first saw it as he stood by the SUV, about a foot away from the vehicle: "I was outside the vehicle, probably maybe a foot away from the vehicle. I bent down, the seat sat fairly high up on the vehicle, and you were able to see underneath the seat." November 21, 2013 suppression hearing transcript ("Hearing Transcript"), p. 117. When

8

Officer Goozdich was first able to see the gun, he was likely inside the doorway of the open door, but not inside the actual vehicle. He never went inside the vehicle or touched the weapon.

Officer Goozdich also saw a platinum, silver or white gold ring under the driver's seat. It was located a few inches from the gun.

Officer Goozdich and Officer Stevens took Jarrett across the street to the police station to the booking counter; Officer Goozdich didn't recall whether they drove him over or walked him over.

While Jarrett was at the booking counter, Officer Goozdich heard Jarrett say "I have a ring also, I believe it's with the keys." Id. at p. 123.

Officer Goozdich told Detective Triana that there was a ring and a firearm under the seat. He also told Detective Triana that Jarrett had made an utterance at the booking counter that he had a ring, that Jarrett believed it was left with the keys.

Officer Goozdich also recalled that Jarrett was wearing jewelry at the time of the stop and arrest: a long necklace with a cross and some other jewelry.

Officer Goozdich was cross-examined by defense counsel with respect to a report he wrote on the traffic stop. In the report, Officer Goozdich wrote that the weapon had been seen in plain view; he did not mention in the same paragraph of the report that the ring also was found in plain view. The report also stated that while Jarrett was being booked, Jarrett stated that he thought he had a ring and that he'd left it with the car keys and that the car keys had been left on the roof of the vehicle. Officer Goozdich noted in the report than the car keys had been left on the top of the vehicle, but that there was not a ring left with the keys. The report also indicated that "no ring was left with the keys to the vehicle, however, a ring was seen near the handgun under the driver's seat where Jarrett had been reaching." Id. at p. 133.

9

Erie police officer Rick Lorah ("Officer Lorah") testified next at the suppression hearing and testified credibly. On April 9, 2013 he was the head of the Erie Police Saturation Unit and had organized the unit to arrest Jarrett in response to a warrant for a robbery. He was in a vehicle with Detective Triana, going to arrest Jarrett when he heard Officers Stevens and Goozdich state over the radio that they believed they had the suspect in a vehicle traveling west of Seventh Street. So Detective Triana and Officer Lorah activated their lights and headed to where Officers Stevens and Goozdich had the suspect pulled over in the Boston Store parking lot. By the time he arrived on the scene, Jarrett was in handcuffs.

Officers Goozdich and Stevens advised Officer Lorah that there was a handgun in plain view underneath the driver's seat of the Saturn Vue. At that point, Officer Lorah went to the vehicle and observed the magazine and grip of a handgun underneath the driver's seat. He initially was outside of the open door, and looked through the window of the door down into the vehicle and saw the firearm. He then walked in between the open car door and the car itself, and bent over; he again saw the gun.

Officer Lorah then went to one of the police cruiser, grabbed a camera and took photographs of the gun. After he was done photographing the firearm, he retrieved it. It was fully loaded, with a bullet in the chamber and the safety off and in a fire position.

Officer Lorah did not see a ring under the seat when he was seizing the firearm.

Officer Lorah completed a property record related to the firearm; it says the gun is a Ruger 9-millileter P95 handgun, serial number 31532957, nine 9-millimeter bullets.

Officer Lorah charged the Defendant with a firearms possession the next day, April 10, 2103. Defendant was rebooked and processed at the Erie Police Department.

Erie police officer Jamie Russo ("Officer Russo") testified next at the suppression hearing and testified credibly. Officer Russo testified that on April 10, 2013, he and his partner, Officer Pete Mitchell, went to the Erie County Prison to take Mr. Jarrett back to the Erie Police Department so Defendant could be processed served with additional charges. Officer Russo did not know what the new charges were for and he did not know whether or not the Defendant had been arraigned the night before.

Officer Russo testified that he walked with Jarrett to the booking counter; his role at this point was to provide security. Officer Mitchell was also present. The booking counter is a secure location with three glass walls where the security officer is behind glass asking questions. Officer Russo described the room as being approximately 12 feet by 8 feet, or 14 feet by 10 feet in size and well lit. When Officer Russo and Defendant were inside the booking area, they were locked in and Jarrett likely was handcuffed. Officer Russo was standing about three to four feet away from Defendant and when they spoke, he spoke to Defendant in a normal voice.

As Officer Russo stood with Defendant near the booking counter, as Mr. Jarrett was being booked on the new charges by the booking officer, Defendant said "I hope they take me federal." Id. at p. 154. This statement was not in response to any question by Officer Russo or the booking officer.

In response to Defendant's statement, Officer Russo "just kind of looked at him and said what, kind of wasn't sure quite what I heard." Id. at p. 154. Officer Russo further explained: "I heard him, I just didn't quite understand what I heard. I guess it's kind of just a natural reaction to say what." Id. "I wasn't quite sure what he said." Id.

The Assistant United States Attorney then had Officer Russo refresh his recollection with his report for the exact words Defendant said next. After reviewing the report, Officer Russo

explained: "He said I hope they don't [sic] take me federal because I know they found the P95 under the seat. And that he gets in trouble, he'd rather do county because he gets in trouble - - he gets in trouble with county, he'd rather do federal." Id. at p. 155. Officer Russo did not ask Jarrett any follow-up questions to this statement because he knew at that point in time what Defendant said was a spontaneous utterance so he didn't want to follow up with any questions.

Officer Russo wrote a report of what Jarrett said at the booking counter five days after the statement was made. He wrote the report because he told the detectives what Jarrett had said and the detectives told him to write a report.

Officer Russo's subjective intent was not to question him. He just had not understood what Jarrett said. "When he made that statement, I wasn't quite sure what he was saying or referring to, it was just my natural reaction to say what. Because I wasn't quite sure what he was saying or what reference or I didn't really understand what was being said. I heard what he said, but I wasn't quite understood exactly what he meant by what he said." Id. at p. 158. "What was just a natural reaction to not understanding what was being said, it was kind of like a what." Id. He also described it as "I was kind of like what, like more of a shock. Not like a conversation...." Id. at p. 165.

The final witness at the suppression hearing was Erie police officer Pete Mitchell ("Officer Mitchell"); he testified credibly. Officer Mitchell testified that he, along with Officer Russo, transported Jarrett to the Erie Police Department on April 10, 2013 so that he could be charged for firearms violations. Officer Mitchell testified that while they were transporting Jarrett in the police car, Jarrett said that had he known that he had an active warrant, he would not have stopped for the police, there would have been a car chase. Officer Mitchell was

12

surprised by the statement. He had not asked Defendant any questions about his charges. Officer Mitchell did not file a report with respect to the comment.

Officer Mitchell further testified that he was not present the entire time that Jarrett was being booked, but that he heard Jarrett make a statement while standing at the booing counter: "there was a statement that was made when I did return as to a P95." Id. at p. 172. He further explained that the statement made by Jarrett was: "Just that that P95, it caught my attention. Also, something along the lines of going to a local or state prison, so he couldn't do it, that he would get in trouble." Id. Officer Mitchell did not hear Officer Russo ask Defendant any questions.

Officer Mitchell also explained that they'd arrived on the scene when Jarrett was arrested the day before and that when he heard that there was a gun in the vehicle, he had gone over to the SUV. He further explained that from standing outside of the doorjamb of the open driver's door, he could see a firearm inside the vehicle.

## II. Legal Analysis.

Again, in his Motion to Suppress, Defendant seeks an Order that would suppress the firearm and ring found by the police when Mr. Jarrett was stopped while driving his girlfriend's black SUV, as well as various statements Jarrett made to the police after he was arrested on April 9, 2013.

### A. Whether the firearm and ring found in the SUV should be suppressed?

Defendant's first contention in support of his motion to suppress the firearm and ring found in the SUV is that the police did not have probable cause to stop Mr. Jarrett because they did not have probable cause to believe the man in the black SUV was Mr. Jarrett. Motion to

Suppress, p. 3. In response, the Government argues:

> Here, officers not only had a valid arrest warrant, but they also clearly saw
> Defendant when he was stopped at a stop sign; they observed him as they drove
> past his SUV; they followed him for a block; they watched him make furtive
> movements after pulling into the Boston Store parking lot; and, when they got out
> of the police car to approach the SUV, they confirmed that it was indeed
> Defendant who was also photographed and thoroughly described in the Wanted
> Poster. Clearly, officers had probable cause to arrest him on the outstanding
> warrant. Accordingly, his claim that the officers lacked probable cause to arrest
> should be dismissed, and his motion to suppress evidence on this ground should
> be denied.

Government's Response to Defendant's Motion to Suppress ("Government's Response"), pp. 5-

6.

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const.

amend. IV; Horton v. California, 496 U.S. 128, 133 (1990). One exception to the general rule

that searches without a warrant are presumptively unreasonable is that "police can stop and

briefly detain a person for investigative purposes if the officer has a reasonable suspicion

supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks

probable cause" i.e. they can conduct a *Terry* stop. United States v. Sokolow, 490 U.S. 1, 7

(1989) (*quoting* Terry v. Ohio, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). However,

if an officer conducts a *Terry* stop without the requisite reasonable suspicion, any evidence

recovered is "fruit of the poisonous tree" and must be suppressed. Wong Sun v. United States,

371 U.S. 471, 488 (1963); see United States v. Brown, 448 F.3d 239, 244 (3d Cir. 2006).

As explained by the Third Circuit Court in U.S. v. Valentine, 232 F.3d 350, 353 (3d Cir. 2000):

> Reasonable suspicion is "a less demanding standard than probable cause and
> requires a showing considerably less than preponderance of the evidence."
> Elaborating on this point, the Supreme Court has said, "Reasonable suspicion is a
> less demanding standard than probable cause not only in the sense that reasonable
> suspicion can be established with information that is different in quantity or
> content than that required to establish probable cause, but also in the sense that
> reasonable suspicion can arise from information that is less reliable than that

14

required to show probable cause." The question we must address is whether [the police officers] had the "minimal level of objective justification" necessary for a *Terry* stop. And in evaluating reasonable suspicion, "we must consider the totality of the circumstances – the whole picture¹."

Id. at 353 (citations omitted). See also United States v. Cortez, 449 U.S. 411, 417 fn. 2 (1981) ("an officer may stop and question a person if there are reasonable grounds to believe that person is wanted for past criminal conduct.").

Initially, we find that the Government only has to establish that they had reasonable suspicion to stop Defendant in the SUV, not probable cause as argued by Defendant. Even applying the higher probable cause standard and requiring the officers to have probable cause to believe it was Jarrett prior to stopping the vehicle he was driving, looking at the totality of the circumstances in this case, they had probable cause to believe it was Jarrett in the SUV and to perform a traffic stop to investigate whether the driver was Defendant and if so, arrest him on the outstanding warrant. Specifically, Officer Stevens and Goozdich both testified credibly that they spotted Defendant stopped at a traffic light across an intersection from where they were stopped at Seventh and French Streets, driving a black SUV, just minutes after being given a wanted poster for the Defendant which contained photographs of Defendant and having been told that he possibly could be driving a black Saturn Vue SUV with license plate JBL-0919. Moreover, they both testified credibly that Defendant slowly drove past them in a black SUV so that they were able to clearly see his face and review the wanted poster to be sure it was Jarrett driving the vehicle, and that they could see that the vehicle was a Saturn Vue that bore the license plate JBL-0919, the exact plate number they had been provided.

Defendant also contends in support of his motion to suppress the firearm and ring found in the SUV that the items should be suppressed because the firearm was not in plain view, the

police lacked probable cause to search the black SUV, he had a reasonable expectation of privacy in the vehicle, and he did not give the officers permission to search the SUV:

> The photographs of the SUV taken from outside the SUV clearly show that the gun was not visible from outside the vehicle. While some of the photographs do show the gun under the seat, those photographs were clearly take from inside the vehicle, and the entry of the vehicle to take the photographs constituted a search. Since the officers could not see the gun from outside the vehicle, their actions in entering the vehicle, no matter how slight that entry, constituted an illegal search of the vehicle, and the gun and the ring found in the vehicle must be suppressed as fruits of the unlawful search.

Motion to Suppress, p. 4.

In response, the Government argues first that the firearm and ring are both admissible under the plain view doctrine. Government's Response, p. 6. With respect to the firearm, the Government contends that "[e]ven assuming that officers bent down or looked inside the SUV from an angle, the firearm that they observed sticking out from under the driver's seat was in plain view and is admissible." Id. at p. 7. With respect to the ring, the Government contends:

> when Defendant was processed at the police station following his arrest, he stated that he'd had a ring inside the SUV. Officers also knew that jewelry had been taken in the robbery for which Defendant was arrested. After officers removed the firearm from under the driver's seat, they found the ring. Just as the firearm is admissible under the plain view doctrine, so is the ring. See Yamba, 506 F.3d at 256 ("The 'plain view' doctrine...is best understood not as an independent exception to the warrant clause, but simply as an extension of whatever the prior justification for an officer's access to an object may be."); United States v. Whitney, 2009 WL 3542796 at *2 (3d Cir. Nov. 2, 2009) (same; under plain view doctrine, police officers who stopped defendant's car for a traffic violation were lawfully in position from which to observe drugs on the floor of his car using flashlight) (citations omitted). When officers were lawfully in place to remove the firearm from under the driver's seat, they were lawfully in place to view the ring that was found next to it. Like the firearm, the incriminating character of which was immediately apparent, the ring was also properly seized as evidence.

Id. at. pp. 7-8.

The Government further contends that the motion to suppress the firearm and ring must be denied because the items are admissible pursuant to the search incident to arrest doctrine. Id. at p. 8. In particular:

> Here, the EPD officers had reason to believe that the SUV contained evidence of the offense of arrest. Specifically, on April 9, 2013, EPD officers had an outstanding warrant for Defendant's arrest for offenses including Robbery, Aggravated Assault, and Possession of Firearms. The warrant stemmed from an incident that occurred the day before, when Defendant allegedly robbed a man at gunpoint, stealing his jewelry. Defendant was believed to be armed, and in a black truck or SUV. When EPD officers arrested Defendant, they saw that he was wearing jewelry, and, during the stop, he moved about inside the SUV in a manner consistent with hiding a firearm or other evidence under the driver's seat. Thus, officers had reason to believe that they would find evidence relevant to the crimes of arrest -- Robbery and Possession of Firearms -- inside the SUV.

Id. at p. 9.

In a related argument, the Government also contends that the motion to suppress the firearm and ring must be denied because the items are admissible pursuant to the automobile exception which states that "[p]olice may search an automobile without a search warrant when they have probable cause to believe it contains contraband or evidence of criminal activity:"

> Here, officers had an outstanding warrant for Defendant's arrest, stemming from a Robbery, Aggravated Assault, and Possession of Firearms offense that occurred only the day before. Officers knew that a man was robbed at gunpoint, and that Defendant had been last seen with a firearm in a black truck or SUV. Immediately before the arrest, officers saw Defendant make a quick forward and then downward motion with his right shoulder, reaching to the floor in a manner consistent with hiding a firearm under the driver's seat. Given the firearms offense that occurred only the day before, the fact that officers believed Defendant to be armed, and because Defendant acted in a manner consistent with hiding a firearm, the officers had probable cause to search the SUV.

Id. at pp. 9-10.

The Government further contends that the motion to suppress the firearm and ring must be denied "because the police would have inevitably discovered the firearm and the ring they recovered from the SUV during an inventory search." Id. at p. 10. "Even if the police officers

had not immediately seen the firearm that he had attempted to hide under the driver's seat, they would have nonetheless impounded the vehicle following his arrest, pursuant to the EPD's towing and vehicle inventory policy. And, in so doing, they would have made a lawful inventory search in which they would inevitably have found the firearm, as well as the ring." Id. at p. 11.

Finally, the Government contends that the motion to suppress the firearm and ring must be denied because the search was lawful pursuant to the consent exception to the warrant requirement: "in this case, after Defendant was arrested and taken into custody, the vehicle he had been driving was impounded by the Erie Police Department. The owner of the vehicle was contacted by law enforcement. She consented to a search of her SUV." Government's Supplemental Response, p. 1 (*citing* Ex. 11 to Supplemental Response). See also Id., p. 2 ("[h]ere, the vehicle owner's consent to the search of her SUV was express; it was voluntary; and the search itself was reasonable in scope, as it was in connection with officers' investigation of Defendant's robbery of a man of his jewelry, at gunpoint, the day before his arrest.").

Again, the Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. A warrantless search is presumptively unreasonable. Horton, 496 U.S. at 133. "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006). One of these exceptions is that a police officer can seize evidence in plain view without a warrant so long as certain requirements have been met. In U.S. v. Menon, 24 F.3d 550 (3d Cir. 1994), the United States Court of Appeals for the Third Circuit explained: "In Horton [v. California, 496 U.S. 128 (1990),] the Supreme Court set forth three requirements for valid seizures of evidence in plain view. First, the officer must not have violated the Fourth Amendment in "arriving at the place from which the evidence could be plainly viewed."

18

Second, the incriminating character of the evidence must be "immediately apparent." Third, the officer must have a "lawful right of access to the object itself." Id. at 559 (quoting Horton v. California, 496 U.S. 128, 141 (1990) (citations omitted)). See also Horton, 496 U.S.at 135 ("Where the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate.").

Applying this law to the facts of this case, we find that that there was a valid seizure of the firearm which was in plain view such that Defendant's Fourth Amendment rights were not violated and the firearm need not be suppressed. The credible evidence introduced at the suppression hearing established that multiple police officers, specifically Officers Triana, Goozdich, Stevens, Lorah and Mitchell all were able to see the firearm located under the driver's seat when they looked into the SUV through open driver's side door. They were lawfully positioned beside, and not inside, the vehicle when they observed the firearm given that they were there as a result of a stop which we have already determined was legal. The incriminating character of the firearm, the police having just arrested Defendant pursuant to an arrest warrant for Robbery, Aggravated Assault and Possession of a Firearm related to Defendant being charged with committing a robbery at gunpoint the day before was immediately evident. Finally, all of these officers had a "lawful right of access to the object itself," i.e. they did not commit an illegal trespass to access the item in plain view.

Similarly, we find that there was a valid seizure of the ring under the plain view doctrine such that Defendant's Fourth Amendment rights were not violated and the ring need not be suppressed. Specifically, based upon Officer Goodrich's credible testimony that he knew from the Wanted Poster that Defendant was being accused of having stolen jewelry and he saw the

19

ring in plain view under the driver's seat at the same time he saw the firearm, we find that: (1) Officer Goozdich had not violated the Fourth Amendment in "arriving at the place from which the evidence could be plainly viewed;" (2) the incriminating character of the ring was " immediately apparent;" and (3) Officer Goozdich had a "lawful right of access to the object itself."

Additionally, we find that Defendant's motion to suppress must be denied as to both the weapon and the ring because these items would have been found by the police when they searched the Saturn Vue as permitted by Tracey Clark, the owner of the vehicle, who we find voluntarily consented to her vehicle being searched. See Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973) ("[T]he question of whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of circumstances.").

For all of the above-stated reasons, Defendant's Motion to Suppress the firearm and ring found in the vehicle when he was stopped and arrested on April 9, 2013 is denied.

**B. Whether any or all of Defendant's various statements made on April 9 and 10, 2013 should be suppressed?**

Defendant also contends that the following statements he made to Officer Russo on April 10, 2013 must be suppressed: "I hope they take me Federal" and "I hope they take me Federal cause I know they found that P95 under the seat, I don't want to do county time cause I get into trouble, I'd rather do federal." In support thereof, Defendant argues:

> There can be no question that Mr. Jarrett was in custody on April 11, 2013 when he was taken by the police from the Erie County Prison to be processed and served with charges based upon the gun found during the illegal search of his vehicle. If the Court believes that Mr. Jarrett spontaneously made the statement "I hope they take me Federal," that statement would not be the product of police interrogation. However, asking Mr. Jarrett "What?" is interrogation as the officer

clearly knew that asking the question was "reasonably likely to elicit an incriminating response" from Mr. Jarrett, that is any response that the prosecution may seek to introduce at trial. Accordingly, Mr. Jarrett's alleged statement must be suppressed.

Motion to Suppress, p. 5. See also Defendant's Post-Hearing Brief, p.1 ("Erie Police Officer Russo's testimony at the suppression hearing established that Mr. Jarrett's statement: 'I hope they take me Federal cause I know they found that P95 under the seat, I don't want to do county time cause I get into trouble, I'd rather for federal,' was made while Mr. Jarrett was in custody and in response to interrogation by Officer Russo. As Mr. Jarrett was not Mirandized prior to interrogation, this statement must be suppressed."); Defendant's Reply to Government's Response to His Post-Hearing Brief.

In response thereto, the Government contends that both of these post-arrest statements were spontaneous and voluntary and not in response to custodial interrogation within the meaning of *Miranda* and therefore, they should not be suppressed. Government's Response, pp. 11-12; In support therefore, the Government argues:

> When Defendant made his April 11 statement, he was not "in custody" for Miranda purposes. Rather, he was simply standing at the booking counter, awaiting transport so that he could be arraigned for other charges. Defendant was in a general area, which was well lit, and not in a locked room. He was being transported as a routine matter, to be processed and served with new charges. The atmosphere was calm and neutral, and the booking officer was not aggressive with Defendant. Defendant himself initiated the conversation with the officer, who was not the officer responsible for investigating the instant case, and the entire encounter was extraordinarily brief. The booking officer merely asked "What?" after Defendant had already begun to speak. The officer asked no follow-up questions, and simply noted what Defendant had told him. A reasonable person in Defendant's position would not have felt that he was compelled to confess to the officer.

Government's Response, pp. 11 and 17. See also Government Post-Suppression Hearing Brief, pp. 2-8, Government's Response to Defendant's Post- Hearing Brief, and Government's Surreply to Defendant's Reply.

The United States Supreme Court has explained that "the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation" and "interrogation" occurs not only when the police subject a suspect to express questioning, but also results from "words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." Rhode Island v. Innis, 446 U.S. 291, 300 and 302 (1980).

It is, of course, well established how a court is to determine whether a defendant is in custody and thus entitled to Miranda warnings prior to questioning. As explained by the United States Supreme Court in J.D.B. v. North Carolina, 131 S.Ct 2394 (2011):

> As we have repeatedly emphasized, whether a suspect is "in custody" is an objective inquiry.
>
> > "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." Thompson v. Keohane, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995) (internal quotation marks, alteration, and footnote omitted).
>
> See also Yarborough v. Alvarado, 541 U.S. 652, 662–663, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004); Stansbury, 511 U.S., at 323, 114 S.Ct. 1526; Berkemer v. McCarty, 468 U.S. 420, 442, and n. 35, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). Rather than demarcate a limited set of relevant circumstances, we have required police officers and courts to "examine all of the circumstances surrounding the interrogation," Stansbury, 511 U.S., at 322, 114 S.Ct. 1526, including any circumstance that "would have affected how a reasonable person" in the suspect's position "would perceive his or her freedom to leave," id., at 325, 114 S.Ct. 1526. On the other hand, the "subjective views harbored by either the interrogating officers or the person being questioned" are irrelevant. Id., at 323, 114 S.Ct. 1526. The test, in other words, involves no consideration of the "actual mindset" of the particular suspect subjected to police questioning. Alvarado, 541 U.S., at 667, 124 S.Ct. 2140; see also California v. Beheler, 463 U.S. 1121, 1125, n. 3, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam).

<u>Id.</u> at 2402.

With respect to determining when there is a custodial interrogation, the <u>Innis</u> Court further explained that:

> The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

<u>Innis</u>, 446 U.S. at 300–01 (1980) (footnotes omitted). In applying <u>Innis</u>, the United States Court of Appeals for the Third Circuit has explained:

> Under the prophylactic rules announced in *Miranda*, a statement made by a suspect in response to custodial interrogation after he or she has elected to remain silent is inadmissible at trial. 384 U.S. at 478–79, 86 S.Ct. 1602. As the Supreme Court held in <u>Rhode Island v. Innis</u>, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), this rule comes "into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers ... to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Id.</u> at 300–01, 100 S.Ct. 1682 (internal footnote omitted). An incriminating response is "any response—whether inculpatory or exculpatory—that the prosecution may seek to introduce at trial." <u>Id.</u> at 301 n. 5, 100 S.Ct. 1682 (emphasis in original). Police may not, however, "be held accountable for the unforeseeable results of their words or actions[,]" <u>id.</u> at 302, 100 S.Ct. 1682, and to constitute an interrogation their conduct "must reflect a measure of compulsion above and beyond that inherent in custody itself." <u>Id.</u> at 300, 100 S.Ct. 1682.

<u>U.S. v. Brownlee</u>, 454 F.3d 131, 146 (3d Cir. 2006).

Turning to facts of our case, Officers Russo and Mitchell testified credibly that at the time Jarrett made the statements at issue on April 10, 2013 at the Erie Police Department

booking counter, Defendant had been arrested the day before, was in the locked booking room of the Erie Police Department with Officer Russo standing near him for security purposes being booked on new charges, he was not free to leave, and likely was in handcuffs. As such, we find that Defendant was in custody at the time he made the statements at issue.

Thus the pivotal issue is whether these statements, made while in custody, were in response to an interrogation by Officer Russo. With respect to Jarrett's initial statement, "I hope they take me Federal," we find that this statement was spontaneous and voluntary on the part of Defendant, and not the result of an interrogation of Defendant by Officer Russo. Therefore, the statement will not be suppressed and will be admissible at trial.

With respect to Jarrett's second statement, "I hope they take me federal cause I know they found that P95 under the seat, I don't want to do county time cause I get into trouble, I'd rather do federal," this statement was made in response to Officer Russo's query "what?" after Jarrett' initial statement "I hope they take me federal." Officer Russo testified credibly that when he said "what?" he did not know what were the new charges being filed against Jarrett, and that he had heard what Jarrett said when Jarrett said "I hope they take me federal," but did not understand what Jarrett said, and so asked him "what?".

The Court agrees with the statement of the appellate court in Tolliver v. Sheets, 594 F.3d 900 (6th Cir. 2010) that "[t]he line between impermissible interrogation and permissible follow-up questions to volunteered statements is a fine one." Id. at 920. After careful consideration of this issue, we find that Officer Russo's query of "what" was a permissible follow-up question to Jarrett's volunteered statement and not "express questioning or its functional equivalent," i.e. not words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response, such that no *Miranda* violation occurred when Officer

Russo said "what?" without first *Mirandizing* Jarrett. As such, Defendant's motion to suppress is denied to the extent that he requests that his statement "I hope they take me Federal cause I know they found that P95 under the seat, I don't want to do county time cause I get into trouble, I'd rather do federal," be suppressed. Said statement is admissible at trial.

Finally, to the extent Defendant contends that his statement made to Officer Mitchell, that had he known that he had an active warrant, he would not have stopped for the police, there would have been a car chase, must be suppressed, we disagree. To the contrary, we find that this statement was spontaneous and voluntary and not in response to custodial interrogation within the meaning of *Miranda*. Therefore, the statement is admissible at trial.

**III. Conclusion.**

We conclude, for all the reasons stated above, that Defendant's Motion to Suppress is denied in its totality. An appropriate Order follows:

## ORDER

AND NOW, this 12th day of February, 2014, it is hereby ORDERED, ADJUDGED and DECREED that Defendant Gerod Maurice Jarrett's Motion to Suppress (ECF No. 28) is DENIED.

Maurice B. Cohill, Jr.
Senior District Court Judge